929 So.2d 447 (2005)
Ex parte Laura SNIDER.
(In re Laura Snider
v.
William Stanley Mashburn).
1040397.
Supreme Court of Alabama.
November 18, 2005.
*449 Joan-Marie Kettell of Kettell & Campbell, L.L.P., Huntsville, for petitioner.
Bill G. Hall and Ronald W. Smith of Ables, Baxter, Parker & Hall, P.C., Huntsville, for respondent.
LYONS, Justice.
The Madison Circuit Court granted William Stanley Mashburn's petition for modification in which he sought custody of his minor child, a daughter. The child's mother, Laura Snider, appealed from the trial court's judgment. A unanimous Alabama Court of Civil Appeals affirmed the trial court's judgment without opinion, Snider v. Mashburn (No. 2030302, Oct. 15, 2004), 921 So.2d 478 (Ala.Civ.App.2004) (table), and Laura petitioned this Court for a writ of certiorari. Based on our preliminary review of the grounds set forth in the petition, we granted the writ, which we now quash. Although Justice Parker concurs in our decision to quash the writ as to the grounds stated in Laura's petition, he dissents from the decision to quash the writ, because he considers meritorious a ground not set forth in the petition. Therefore, in order to provide full context, we first explain the basis for concluding that the writ should be quashed. We then explain why we disagree with Justice Parker's conclusion that we should address an issue not raised in Laura's petition.

I. Factual Background and Course of Proceedings
Laura and William were divorced in May 1997 when their daughter was 5 1/2 months old. By agreement, Laura, who was living in Cullman at the time, was given custody. In November 1999, Laura remarried, and she and the child moved to Birmingham to live with Laura's husband, Brian. Sharp conflicts arose as to what standards and practices were to be used in caring for the child during William's exercise of his visitation rights (as to watching TV and movies, dressing the child, etc.).
*450 Brian and Laura spend a significant portion of their time preparing video documentaries for a missionary named David Cloud. In December 2002, Laura, Brian, and the child moved to a rural area of Indiana in order for Brian and Laura to be located closer to their missionary work. Additional disputes arose between the parties regarding Brian's relationship with the child and regarding the use of corporal punishment in Brian and Laura's home.
William petitioned the trial court for a change in custody, which the court granted. Laura appealed to the Court of Civil Appeals, which unanimously affirmed the trial court's judgment. Laura filed a petition with this Court for a writ of certiorari, in which she claimed that the Court of Civil Appeals' affirmance of the trial court's ruling conflicts with Ex parte McLendon, 455 So.2d 863 (Ala.1984), which held that, before a parent may reclaim custody of a child, he or she must show that the change of custody will materially promote the child's welfare. Laura also claimed that the ruling of the Court of Civil Appeals conflicts with Clift v. Clift, 346 So.2d 429 (Ala.Civ.App.1977), which held that a change in a parent's religious beliefs cannot be the sole factor considered in a child-custody determination but that "questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding." 346 So.2d at 435. We granted Laura's petition so that we could review the entire record.

II. Standard of Review
"When evidence in a child custody case has been presented ore tenus to the trial court, that court's findings of fact based on that evidence are presumed to be correct. The trial court is in the best position to make a custody determination  it hears the evidence and observes the witnesses. Appellate courts do not sit in judgment of disputed evidence that was presented ore tenus before the trial court in a custody hearing."
Ex parte Bryowsky, 676 So.2d 1322, 1324 (Ala.1996). "`"[W]e will not disturb the trial court's findings of fact unless those findings are plainly and palpably wrong and not supported by the evidence." Williams v. Lide, 628 So.2d 531, 534 (Ala. 1993) ....'" Ex parte N.L.R., 863 So.2d 1066, 1068 (Ala.2003) (quoting Eubanks v. Hale, 752 So.2d 1113, 1144-45 (Ala.1999)). In Ex parte Fann, 810 So.2d 631, 633 (Ala.2001), this Court stated:
"When this Court reviews a trial court's child-custody determination that was based upon evidence presented ore tenus, we presume the trial court's decision is correct: `"A custody determination of the trial court entered upon oral testimony is accorded a presumption of correctness on appeal, and we will not reverse unless the evidence so fails to support the determination that it is plainly and palpably wrong ...."' Ex parte Perkins, 646 So.2d 46, 47 (Ala. 1994), quoting Phillips v. Phillips, 622 So.2d 410, 412 (Ala.Civ.App.1993) (citations omitted). This presumption is based on the trial court's unique position to directly observe the witnesses and to assess their demeanor and credibility. This opportunity to observe witnesses is especially important in child-custody cases."
(Emphasis added.)

III. Grounds Presented in the Petition for the Writ of Certiorari

A. Conflict with McLendon
Laura argued in her petition for a writ of certiorari that the affirmance by *451 the Court of Civil Appeals of the trial court's ruling conflicts with McLendon, supra, which states:
"`Where a parent has transferred to another [whether it be a non-parent or the other parent], the custody of h[er] infant child by fair agreement, which has been acted upon by such other person to the manifest interest and welfare of the child, the parent will not be permitted to reclaim the custody of the child, unless [s]he can show that a change of the custody will materially promote h[er] child's welfare.'
"....
"`. . . [T]he party seeking modification [must] prove to the court's satisfaction that material changes affecting the child's welfare since the most recent decree demonstrate that custody should be disturbed to promote the child's best interests. The positive good brought about by the modification must more than offset the inherently disruptive effect caused by uprooting the child. Frequent disruptions are to be condemned.'"
455 So.2d at 865. Based on McLendon, it was William's burden at the custody hearing to show that a change in custody would materially promote the child's welfare, would be in her best interests, and would offset the effect of uprooting her from Laura and Brian's home in Indiana.
Justice Parker's dissenting opinion presents what he contends are the facts involved in this case. In presenting those facts, however, Justice Parker views the evidence most favorably to Laura, the party who did not prevail after the ore tenus hearing in the trial court. Viewing the evidence from that perspective, however, is not appropriate. See Ex parte Dan River, Inc., 794 So.2d 386, 394 (Ala.2000) ("We are bound to accept the tendencies of the evidence most favorable to the winner of a judgment based on evidence ore tenus."). See also Ex parte Pielach, 681 So.2d 154, 154-55 (Ala.1996):
"The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence. Ex parte Kent Corp., 641 So.2d 242 (Ala. 1994). The reason for giving such deference to the trial judge's findings based on disputed evidence in ore tenus proceedings is that the trial judge has the benefit of observing the witnesses' manner and demeanor and has the better opportunity to pass upon the credibility of their testimony."
We set out below the trial court's findings adverse to Laura, and we then summarize the evidence presented in her favor.
In its order granting William's petition for modification, the trial court stated:
"This Court finds from the evidence that the present husband of the Mother, Brian Snider, has engaged in a concerted pattern of behavior intended to control, both physically and emotionally, and isolate the Mother, and as a direct consequence, the parties' minor child,. . . who is presently six years of age, having been born on November 12, 1996. This Court finds that the conduct of Brian Snider, as it directly relates to and affects this child, is extremely detrimental, both physically and emotionally, to the child; and further finds that the Mother has participated in, condoned, and/or, at the very least, acquiesced to the actions of her husband. The evidence presented to this Court in the trial of this case included the following facts:
"(a) The child was encouraged to call *452 Brian Snider `Papa.'[1]
"(b) Brian Snider hit the child in the head with his hand in an attempt to discipline the child for saying something that he felt was wrong. The child was only five years old at the time. Even though Brian Snider acknowledges that his doing so was totally inappropriate, the testimony of the Mother was that he was `out of control' at the time, and that she did not do anything about it. When confronted by the Father about his striking the child in the head, Brian Snider refused to assure the Father that it would not happen again.
"(c) Brian Snider whipped the parties' child when she told the Mother and Brian Snider that she had watched a PG-13 movie, `Miss Congeniality,' with the Father and others while she was visiting with her Father. This Court finds the actions of Brian Snider in doing so to be unconscionable.
"(d) The Mother and Brian Snider relocated their residence, and the residence of the parties' child, to a very rural area in the State of Indiana, even though neither of the parties had any family, nor established business, in the State of Indiana. In doing so, the Mother and Brian Snider isolated and removed this child from the large and loving family support system that she had previously enjoyed in the State of Alabama, which consisted not only of the Mother's family, and the Father, but the family of Brian Snider as well, with whom the child also enjoyed a close and loving relationship. As admitted by the Mother in her testimony, the move to Indiana was of `no benefit to the child.'
"(e) The Mother and Brian Snider have told this child that her Father and maternal grandfather are `going to hell,' knowing that the people referred to are loved and cared for very much by the child.
"(f) Brian Snider has alienated every member of the Mother's family, with whom the child and the Mother enjoyed a close and loving relationship prior to her marriage to Brian Snider. By doing so, her family support system was eliminated; and Brian Snider succeeded in becoming the only source of support available to the Mother, making her thereby completely dependent on him and him alone.
"(g) The alienation of the Mother and the child from her family is so complete that the Mother testified that she did not think that it was positive for the parties' child to have contact with her family, except under her direct supervision and only for a short time interval; and that she is not willing to foster a good relationship between the child and the members of her family. The Court notes from the testimony that the family from whom the Mother and child are now alienated provided her not only a place to live, but for the support and care of the parties' child following the separation of these parties; and had at all times prior to her marriage to Brian Snider, enjoyed a close, loving relationship with the child.
"(h) Brian Snider, on one occasion, chastised the child for going with her grandparents to the theater to see the Disney movie `Finding Nemo.' On another occasion, he and the Mother forcibly removed the child from the physical custody of the Mother's sister during the Father's period of visitation, simply because the Mother's sister had been allowed *453 by the Father to take the child to the birthday party of her maternal grandmother.
"(i) Even though the Mother had only dated Brian Snider for two months prior to their marriage, within six months of their marriage, Brian Snider and the Mother approached the Father and requested that he allow Brian Snider to adopt [the child]. The Father adamantly refused to do so.
"(j) Brian Snider has actively interfered with the communications between the Father and the Mother, and the decisions to be made by them concerning their child, to the point that the exercise of visitation by the Father with the child could only be accomplished with undue and unnecessary pressure and hardship.
"(k) The Mother testified that the relationship of the parties' child, ... with Brian Snider is more important than her relationship with the Father, because Brian Snider `spends more time with her.'
"(l) Brian Snider testified that the parties' child, ... is `caught in the middle,' and is getting `mixed signals' as a result of the differences between the parties' households. However, the actions of Brian Snider, and the rigid and controlling manner in which he has dealt with the parties' child, has greatly exacerbated the emotional pressures put on this child as a result of those differences.
"(m) The Mother has indicated that she is submissive to Brian Snider, which is certainly her decision to make; but further asserted that `[the child] is under his (Brian Snider's) control, too.'
"(n) The actions of Brian Snider resulted in a significant and detrimental change in the personality and behavior of the child, which this Court finds to have been a direct result of his conduct towards her. The Court finds that since she has been placed in the pendente lite custody of the Father, the child is now happy and well adjusted, and is being well cared for by the Father in his household.
"(o) Brian Snider and the Mother made demands on the Father for him to conform his household to adhere to their demands, including the child wearing long clothing, no mixed swimming by the child with members of the opposite sex, and even to the extent of not allowing the Father to place the child in summer care at the local YMCA. When the Father refused on one occasion to accede to her demands, the Mother brought law enforcement officers to the Father's home to get the child.
"(p) This Court finds the Father to have a calm and non-aggressive personality; and that he did not exhibit any hostility towards the Mother or Brian Snider in his testimony, but rather exhibited a genuine concern for the health and welfare of his child. The Court also found the members of the Mother's family, who testified in support of the Father in this case, to be loving, and without hostility towards the Mother."
We have reviewed the entire transcript of the final custody proceeding. No useful purpose would be served here by further elaboration of the ample evidence supporting the trial court's findings.
Of course, as is usually the case in these types of proceedings, the evidence is not wholly one-sided. We note that Laura testified that she and the child play games together, that they go horseback riding, and that they used to go ice skating.[2] *454 Laura also testified that she is a competent homeschool teacher, and that the child has progressed under her teaching. She further testified that since she and Brian married, the child has visited Yellowstone National Park, Mount Rushmore, the Statue of Liberty, Washington, D.C., and Nepal. All of this travel was associated with the ministry work in which Laura and Brian are involved, although Laura testified that she plans to decrease her travel now that the child is older.[3] Laura also testified that, after she and William were divorced, William took advantage only of approximately half of his allotted visitation time with the child. She also testified that William is a racist.
Brian testified that William attacked him on one occasion, unprovoked, although William testified that Brian provoked the attack by repeatedly poking him in the chest. There was additional testimony indicating that William drinks regularly, although not to the point of intoxication, and that he has roughly $24,500 in unsecured credit-card debt. Lastly, there was testimony indicating that William's mother, who sometimes cares for the child, has bipolar disorder, although with medication she keeps her symptoms under control.
The trial court referred to Brian Snider's control over the child as having the effect of isolating the child from her natural father and from her extended family, all of whom, according to the trial court, were loving providers and part of the child's support system. Brian's "control" of the child effectively excluded William's views regarding the upbringing of his daughter and led to the isolation of the child from all other members of her family, including Laura's own father and stepmother who, as previously noted, testified in favor of William, their former son-in-law, in this proceeding.
The trial court found, and the record shows, that Brian spanked the child for watching a movie that was rated PG-13[4] while she was visiting her father. However, the trial court cited the incident not because the court believes that children should not be punished for watching what some parents might consider inappropriate movies, but because Brian punished the child for doing something that her natural father gave her express permission to do. The trial court found this conduct to be "unconscionable" and, therefore, against the child's best interests.
The existence of conflicts in the evidence at the hearing, standing alone, does not warrant reversal, because the trial court's findings of fact, along with the custody determination itself, are afforded a presumption of correctness. And this Court cannot conclude based on the record before us that the trial court's transfer of custody to William was "plainly and palpably wrong." Ex parte Fann, 810 So.2d at 633. Therefore, the Court of Civil Appeals' affirmance of the trial court's judgment does not, as Laura contends, conflict with McLendon.

*455 B. Conflict with Clift
Laura also argued in her petition for a writ of certiorari that the ruling of the Court of Civil Appeals conflicts with Clift, supra, which holds that "religious beliefs alone shall not constitute the sole determinant in child custody awards." 346 So.2d at 434. The record does reveal that the majority, if not all, of the actions taken by Brian and Laura with regard to the child were pursued in adherence to their religious beliefs. However, while Clift did hold that religion cannot be the sole determinant in a child-custody award, it also recognized:
"[T]hat one's religious beliefs may not serve as the sole consideration in a child custody proceeding does not necessarily preclude exploration into those beliefs. In this State, as in other jurisdictions, the ultimate consideration in determining the proper custody of the child is what is in his best interests....
"`....'
"... We hold that questions concerning religious convictions, when reasonably related to the determination of whether the prospective custodian's convictions might result in physical or mental harm to the child, are proper considerations for the trial court in a child custody proceeding."
346 So.2d at 435 (emphasis added). Thus, the trial court was not precluded from considering the effect on the child of Brian and Laura's parenting practices simply because those practices were based on religious beliefs. The trial court found that "[t]he actions of Brian Snider resulted in a significant and detrimental change in the personality and behavior of the child, which [the court found] to have been a direct result of [Brian's] conduct towards her," and that "since she has been placed in the pendente lite custody of [William], the child is now happy and well adjusted, and is being well cared for by [William] in his household."
The record reveals evidence sufficient to support the trial court's ruling, and in its written order, the court expressly states that it did not rely solely on religion in making its decision:
"This Court has not decided this case based on the religious beliefs of either of the parties to this action. While it is true that there is considerable difference in religious beliefs between the households of the parties, this Court does not find it appropriate, legally or otherwise, to base its decision on whether or not this Court agrees or disagrees with a party's religious beliefs."
The fact is that the evidence was in dispute, but it is clear from a reading of the record that the trial court's findings of fact and its determination that a change in custody would materially promote the child's welfare were not plainly and palpably wrong. See generally Pielach, 681 So.2d at 154 ("The appellate courts are not allowed to substitute their own judgment for that of the trial court if the trial court's decision is supported by reasonable inferences to be drawn from the evidence.").
The trial court was obviously impressed with the solidarity of the child's extended family in its support for the change of custody to William.[5] At the time of the final hearing, the child had been living with William for five months. Laura's father described the personality and behavioral changes in his daughter and granddaughter after Laura's marriage to Brian, as well as his granddaughter's return to *456 normal after custody had been awarded to William pendente lite.
We conclude that the trial court did not base its ruling solely on the religious beliefs of Brian and Laura (or, for that matter, William), but rather on the best interests of the child. Because the trial court's order was not based solely on the religious beliefs of any of the parties involved in this case, the Court of Civil Appeals' affirmance of the trial court's ruling does not conflict with Clift.

IV. Grounds Not Presented in the Petition for Certiorari
The dissenting opinion of Justice Parker concedes the correctness of this Court's conclusion that we should not grant review of the trial court's determination as to custody. The dissenting opinion also acknowledges that Laura failed to assert as a ground for issuance of the writ of certiorari any error with respect to the trial court's restriction upon her conduct during her visitation with the child. The dissent urges this Court to disregard what it refers to as a "legal nicety" and consider the validity of this restriction, pointing to a paragraph in Laura's brief, in which she contends that the trial court "exceeded its authority by restricting the Mother by only permitting her to train the child in her religious views `by example.'" (Laura's Brief at 38-39.)[6]
Assuming, for the sake of argument, the validity of Justice Parker's contention that in a child-custody case we can overlook all procedural shortcomings, we cannot agree with the conclusion in the dissenting opinion that what it describes as the trial court's "sweeping directive" in this proceeding violates Laura's constitutional right to free exercise of religion.
The trial court's order states:
"[T]he religious training of the child while in the home of the Mother for visitation shall be made by example, and not by any religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."
Because Laura did not challenge the trial court's order by any posttrial proceeding raising the point she now advances in her brief to this Court, we are faced with a question of how to interpret the trial court's order. In this context, we lack the trial court's reaction to Laura's broad reading of the order and are therefore placed in a position analogous to a court's being called upon to interpret the effect of a previous order in a proceeding. In Moore v. Graham, 590 So.2d 293, 295 (Ala. Civ.App.1991), the Alabama Court of Civil Appeals, citing Hanson v. Hearn, 521 So.2d 953 (Ala.1988), accurately summarized this Court's holdings as to the construction of judgments as follows:
"Judgments are to be construed like other written instruments. The rules applicable to the construction and interpretation of judgments are those applicable to the construction and interpretation of contracts. Hanson v. Hearn, 521 So.2d 953 (Ala.1988). Separate provisions of judgments, like provisions of contracts, should be construed in pari *457 materia, and the entire judgmentall provisions consideredshould be read as a whole in the light of all the circumstances, as well as of the conduct of the parties. Id. Further, if the terms of a judgment are not ambiguous, they should be given their usual and ordinary meaning."
In the context of construing contracts, this Court has said that "[u]nder ... established rules of contract construction, where there is a choice between a valid construction and an invalid construction the court has a duty to accept the construction that will uphold, rather than destroy, the contract." Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000). See also Clark v. Board of Dental Exam'rs of Georgia, 240 Ga. 289, 294, 240 S.E.2d 250, 254 (1977) ("`When a judgment is susceptible of two meanings, one of which would render it illegal and the other proper, that construction will, if reasonably possible, be given it that would render it legal.'" (quoting Byrd v. Goodman, 195 Ga. 621, 25 S.E.2d 34 (1943))).
The dissenting opinion reads the trial court's order too broadly in agreeing with Laura's characterization in her brief of the order, which she says confines her exclusively to training the child in her religious views "by example." Yet the order does not stop with the reference to training by example. It goes on to condemn "religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."[7] By clear implication, the order countenances religious training on a broad spectrum, so long as it does not run afoul of the trial court's prohibition against the disparagement of William's beliefs. Cf. Hagler v. Hagler, 460 So.2d 187, 189-90 (Ala.Civ.App.1984) (recognizing the trial court's discretion in dealing with instances in which a custodial parent uses that position to alienate the child from the other parent). Nothing in the trial court's order prevents Laura from teaching the child every facet of the Christian faith and every principle and lesson contained in the Bible. This can be done by any parent without disparaging or criticizing his or her former spouse.
In her brief in support of her petition for certiorari, Laura cites Ex parte Hilley, 405 So.2d 708 (Ala.1981), a child-custody case.[8] Because the mother in Hilley, who had been awarded custody of her children, was an evangelist and church-choir member, she attended church frequently, sometimes until 11:00 p.m. or later, and she would take her children with her. The trial court awarded custody of the children to the mother, but conditioned that custody award as follows:
"`That during the time that the children are in the care, custody, and control of [the mother], she will curtail all activities that require her to be away from the children, or requires the children to travel from the home during the week except for one church function of reasonable duration and normal school and social functions in which the children may become involved.'"
The trial court stated that, but for the restriction quoted above, it would have awarded custody of the children to their father.
*458 This Court held that the trial court's order unduly restricted the mother's right to practice her religion. The Court distinguished orders involved in similar, but not identical, cases:
"In none of the cited cases did the orders prohibit the parents from themselves following and/or engaging in the beliefs and practices of their chosen religion. The orders merely prohibited the parents from binding the children to their particular beliefs or practices when they threatened the health or welfare of the children. The order in the present case, however, goes beyond that. It effectively restricts [the mother's] free exercise of her chosen religion by providing that `she will curtail all activities that require her to be away from the children....' Thus, [the mother] is not free to attend church or other church related activities during that time when the children are out of school because the order does not permit her to leave the children in the care of a babysitter or other suitable attendant."
405 So.2d at 711 (emphasis added). The Court, by noting that a babysitter or other attendant would have been a better means of avoiding keeping the children up and out at all hours of the night, implicitly recognized that it might not be in the best interests of the children to attend all of the church services the mother attended. Put another way, it appears that an order prohibiting the mother from taking her children to all of the church functions would not have run afoul of her right to free exercise of religion. Hilley, therefore, does not stand for the proposition that a court may never restrict in any way a custodial parent's exposure of her child to the parent's religion.
In the instant case, the trial court prohibited Laura, while teaching her religion to the child, from disparaging the child's father. The child was only 6 1/2 years of age when this order was entered. The trial court did not err in determining that such a restriction was in the child's best interests at the time. We decline to hold that, under the facts here presented, the trial court's order prohibiting a parent from disparaging the other parent violates the first parent's right to free exercise of religion.
The child is now approaching nine years of age. If Laura considers that circumstances with respect to the child's current level of maturity or other circumstances warrant greater freedom on Laura's part during visitation with respect to the child's religious training, including latitude to make comments she might deem appropriate about her father's and grandparents' faith, a motion in the trial court seeking such relief is the appropriate vehicle.[9] That procedure will give the trial court the opportunity to address an issue not heretofore raised[10] and decide that issue in light of the circumstances then presented, the authorities marshaled so forcefully in the dissenting opinion, and whatever additional authorities Laura and William may submit. And, for all that appears, some or all of these issues may well be resolved by mediation in the trial court. Further, in the *459 event that the case reaches this Court, we will have the benefit of the trial court's reasoning, as well as that of the Court of Civil Appeals, presumably a petition adequately stating grounds, and briefs from both parties fully developing these important issues.

V. Conclusion
The Court of Civil Appeals' affirmance of the trial court's judgment does not conflict with the cases relied upon by Laura in her petition for a writ of certiorari. Because the trial court's order, when read fairly and objectively, does not impermissibly infringe upon Laura's right to the free exercise of her religion, this case does not warrant the exercise of the Court's power to overlook Laura's failure to assert the ground, based on her reading of the order, in her petition for the writ of certiorari. Without in any way denigrating Justice Parker's views on the importance of religion in society, we do not think this case provides the appropriate occasion for further consideration of these important constitutional issues. We therefore quash the writ.
WRIT QUASHED.
NABERS, C.J., and SEE, HARWOOD, STUART, SMITH, and BOLIN, JJ., concur.
WOODALL, J., concurs in the result.
PARKER, J., dissents.
PARKER, Justice (dissenting).
The right to worship God according to the dictates of one's conscience is the most cherished star in our constitutional constellation. Thus, civil government can overreach in few ways more egregious than by invoking the law to restrict a mother from teaching her child the worship of God. Yet, this is precisely what has occurred in this case by means of a lower court order. Consequently, I must vigorously dissent from the majority's refusal to overturn the offending portion of that order.

I.

Factual Background[11]
William and Laura Mashburn were divorced in May 1997, when their daughter was just five months old. By agreement, Laura was awarded custody of the child. She soon converted to a conservative Baptist denomination and, in 1999, married Brian Snider, who shared her new religious convictions. Benefiting from her new husband's provision, Laura chose to resign from her job and become a full-time homemaker in order to spend more time with her daughter, whom she homeschooled. Laura also assisted Brian in his work preparing video documentaries for a missionary ministry. As part of the child's homeschooling, the Sniders took her with them on trips abroad when they were filming documentaries. In December 2002, without objection by William, the Snider *460 family moved to the Indiana countryside to be closer to ministry headquarters.
Laura considered her duties as a parent to include the religious and moral instruction of her child, and she sought to follow Biblical standards in child-rearing. Laura tried to protect her daughter from worldly influences, including immoral TV shows and movies, and to have her dress in a feminine and modest way. Laura also followed the Bible by using corporal punishment to discipline the child when she misbehaved. Laura asked William to adhere to these standards during visitation and her father and stepmother to follow them when William left the child in their care.
Although William initially agreed to adhere to Laura's requests, he subsequently reneged on the agreement, drinking beer in front of the child on nearly a daily basis,[12] uttering profanity in her presence, and permitting her to watch TV shows and dress in clothing contrary to the standards he and Laura had agreed upon. William also left the child in day-care arrangements in which those agreed-upon standards were not followed.
Laura's father and stepmother likewise opposed Laura's religious convictions and child-rearing standards and refused to follow them. According to her father, Laura's requirements of long dresses and modest swimwear for her daughter were not "normal," so he and his wife disregarded them.[13] The maternal grandparents also disregarded Laura's instructions regarding the child's TV viewing. Laura's father justified his flouting of her instructions in these and other matters on the theory that grandparents have an independent right to make judgments about what is right for their grandchildren, provided they do not permit anything "objectionable to society as a norm."
The grandparents' efforts to impose what they regarded as society's norms were not limited to those occasions when the child was in their home. According to Laura, the grandparents "constantly berated" her for her conservative religious beliefs and attempted to pressure her into changing her practices in her own home.
A particular bone of contention was Laura's choice to personally oversee the education of her daughter by homeschooling her. Laura's stepmother, a state schoolteacher, believed that Laura was not qualified to teach her daughter "since [Laura] was not trained as a teacher" and was "not an education major." Although she conceded under examination that Laura is "very smart" and deserved some credit for educating the child well, Laura's stepmother claimed the child would "suffer" if the homeschooling were to continue.
Laura unsurprisingly regarded her father and stepmother's refusal to follow her instructions as an effort to "undermine" what she was trying to teach her daughter. Consequently, Laura took steps to preserve her authority and protect the child by limiting her visits to the maternal grandparents to times when she was accompanied. The grandparents resented their reduced access to the child, and they blamed Brian for Laura's conservative convictions. They also blamed Brian for the alienation resulting from their refusal *461 to conform to Laura's standards for her daughter.
As these disputes over which religious standards would be followed in rearing the child were ongoing, William petitioned the trial court for a change in custody. Recognizing the fundamental conflict between the religious views and practices of William, on the one hand, and the Sniders, on the other, the trial court asked during its own questioning of Brian, "Whose standard is to be applied?" The court also stated, "[T]here's no room for compromise.... Right?"
After the proceedings ended, the court issued its order. Not only did the court transfer custody of the child from Laura to William, but it also involved itself in the conflict of religious viewpoints by siding with William and ordering Laura to stop teaching her daughter the worship of God where such teaching would be critical "in any way" of William's more liberal religious views or practices:
"[T]he religious training of the child while in the home of the Mother for visitation shall be made by example, and not by any religious training which would otherwise be disparaging or critical of in any way the beliefs of the Father, and/or the way in which his household is conducted."
The trial court justified this sweeping directive solely on the ground that it would prevent the child from feeling "unnecessarily confuse[d] or pressurize[d] [sic]" by the differences in her parents' religious views and practices.
Although Laura appealed to the Court of Civil Appeals, it affirmed the trial court's judgment without an opinion. Snider v. Mashburn (No. 2030202, Oct. 15, 2004), 921 So.2d 478 (Ala.Civ.App.2004) (table). Laura then petitioned this Court for a writ of certiorari and requested reversal of both the transfer of custody and the directive restricting her right to train her daughter in the worship of God. Although this Court initially granted Laura's petition, the majority today quashes that writ without addressing the merits of Laura's claim that her rights were infringed and without explaining why that claim may not be addressed.

II.

The trial court's order restricts Laura's right to teach her child the worship of God.
The majority's refusal to consider the merits of Laura's claim is very troubling, as Laura implicates the trial court in the infringement of two closely connected, God-given and inalienable rights  the right to free exercise of religion and the right to freedom of expression in the training of one's children:
"[T]he trial court exceeded its authority by restricting the Mother by only permitting her to train the child in her religious views `by example.' The mother should be free to explain the teachings of her church to the child and to continue to foster her child's development as a Christian."
(Petitioner's brief, pp. 38-39.) Given the exceptional importance of these rights, I believe this Court has a duty to fully consider the claims of the infringement of these rights now rather than inviting the parties to restart the potentially lengthy and costly litigation process all over again, as the majority opinion directs.
Unfortunately, rather than address the vital substance of Laura's concern, the majority ignores it and instead criticizes the form in which she expressed that concern by suggesting that Laura has interpreted the trial court's order more broadly than the court intended. 929 So.2d at 457. It is true that Laura's restatement of the trial court's order could have been more precise  just as the language of the trial court's order could have been more precise *462  but I do not find Laura's characterization of the order to be inaccurate when considered in context. Moreover, even the most deferential reading of the trial court's order fails to address what I consider to be the most important issue in this case: whether the trial court overreached by ordering Laura to stop teaching her child the worship of God to the extent that such teaching conflicted with William's beliefs or practices.[14]

III.

This Court may consider Laura's claim that her religious liberties were infringed by the trial court's order.
Ordinarily, on a petition for a writ of certiorari, this Court limits its review to the issues raised in the petition. Ex parte Bland, 796 So.2d 340, 343 (Ala.2000). However, we have long held that in child-custody proceedings, equitable considerations trump procedural technicalities. As Justice Smith  joined by Chief Justice Nabers, Justice Stuart, and Justice Bolin  wrote earlier this year, where the custody of children is at issue, "this Court `will not be governed by legal niceties in pleading.'" Ex parte G.C., 924 So.2d 651, 665 (Ala.2005) (Smith, J., concurring specially) (quoting Evans v. Evans, 264 Ala. 2, 6, 84 So.2d 337, 340 (1955)). In fact, it is "well settled" in Alabama that "in proceedings involving the custody of children," a court "is not bound by any strict rules of pleading or procedure." Hardy v. Hardy, 250 Ala. 297, 299, 34 So.2d 212, 213 (1948) (emphasis added).
*463 In the instant case, although Laura failed to explicitly raise the issue of the trial court's infringement of her religious rights in her petition for the writ of certiorari, she did explicitly raise the issue in her supporting brief, which was submitted to this Court bound with her petition as one document. Consequently, I consider Laura's procedural error to be one this Court may overlook as a failure to comply with a "legal nicety" unless doing so would violate William's due-process rights.
Under the circumstances, the only due-process right I can imagine could possibly be infringed is William's right to receive adequate opportunity to respond to the issue raised. Because William did receive notice of the issue in Laura's supporting brief and responded to it in his reply brief, it is evident that William did have adequate opportunity to respond. Thus, his due-process rights would not be violated by our overlooking Laura's procedural error. Consequently, I find no procedural obstacle to this Court's considering the merits of Laura's claim.
The majority opinion also appears to have found no obstacle to considering the merits of Laura's claim. In fact, the majority opinion declines to challenge the applicability of the standards of Evans and Hardy to this case. Nevertheless, rather than deciding the issue before us, the majority opinion avoids the issue by inviting Laura to begin the litigation process all over again at the trial level. According to the majority opinion, this is "the appropriate vehicle" for her to seek justice in the courts because it would allow full development of "these important issues." 929 So.2d at 458-59.
To be sure, the vehicle advanced by the majority is one possible vehicle for Laura under the precedent of Ex parte Lipscomb, 660 So.2d 986 (Ala.1994), cited by the majority, but it is not, as the majority opinion suggests, the only appropriate vehicle. In fact, the procedural delay caused by the option suggested by the majority opinion is inadvisable, not only because it undermines the administration of justice by inviting additional litigation but also because it needlessly burdens both parties by forcing them to devote further time and to incur additional legal costs in a matter this Court could easily address today. Most importantly, the majority's approach contravenes the best interests of the child, who might have to wait literally years for the courts to complete reconsideration of the issues.
I am therefore completely unconvinced by the rationale offered by the majority opinion for excusing this Court's prompt consideration of what it admits are "important" issues. Because of this, I would consider these issues without further delay. I do so below, first by providing the historical understanding and context of American recognition of the right to worship God and, second, by evaluating the trial court's order under the Alabama Constitution today.

IV.

The right to worship God is an inalienable, God-given right recognized by the Founders of the United States.
For innumerable Americans and Alabamians, from the founding of this Nation to the present, the worship of God and faith in His providence have provided hope for a blessed life on earth and salvation in eternity.
Recognizing faith in God as the bulwark of our freedom, the Founders deliberately grounded American independence on the "Laws of Nature and of Nature's God." See Declaration of Independence. In this regard, Jefferson asked:

*464 "Can the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that these liberties are the gift of God? That they are not to be violated but with His wrath?"
Thomas Jefferson, Notes on the State of Virginia, 1782, in Andrew M. Allison, M. Richard Maxfield, K. DeLynn Cook, and W. Cleon Skousen, The Real Thomas Jefferson 523 (National Center for Constitutional Studies, Washington, D.C., 2d ed.1983). In his second inaugural address, Jefferson elaborated further on the necessity of reliance on God as the Author and Preserver of our liberties and blessings:
"I shall need ... the favor of that Being in whose hands we are, who led our forefathers, as Israel of old, from their native land, and planted them in a country flowing with all the necessaries and comforts of life; who has covered our infancy with His providence, and our riper years with His wisdom and power; and to whose goodness I ask you to join with me in supplications, that He will so enlighten the minds of your servants, guide their councils, and prosper their measures, that whatsoever they do shall result in your good, and shall secure to you the peace, friendship, and approbation of all nations."
Thomas Jefferson, Second Inaugural Address, 1805; quoted in Allison, 403-04.
The Framers of the United States Constitution rightly perceived that the worship of God includes both a corporate and an individual dimension. In the darkest days of the Constitutional Convention, with delegates strongly divided, Benjamin Franklin brought them together by an appeal to the corporate dimension of worship, reminding those gathered of God's role in the formation and preservation of this Nation:
"In the beginning of the contest with Britain, when we were sensible of danger, we had daily prayers in this room for the divine protection. Our prayers, Sir, were heard  and they were graciously answered....
"I have lived, Sir, a long time; and the longer I live, the more convincing proofs I see of this truth, that God governs in the affairs of men. And if a sparrow cannot fall to the ground without his notice, is it probable that an empire can rise without his aid? We have been assured, Sir, in the sacred writings that `except the Lord build the house, they labor in vain that build it.' [Psalm 127:1]. I firmly believe this; and I also believe that, without his concurring aid, we shall succeed in this political building no better than the builders of Babel...."
Benjamin Franklin, June 28, 1787, in James Madison, Notes of Debates in the Federal Convention of 1787 209-210 (Ohio University Press, 2d prntg.1985).
George Washington also recognized the importance of corporate worship in 1796 when he emphasized that "Religion and Morality are the essential pillars of civil society." Ashbel Green, The Life of Ashbel Green, by Himself 615 (1849). Washington further recognized that the irreducible core of religious liberty is the individual's right to worship God:
"The liberty enjoyed by the people of these States, of worshipping Almighty God agreeably to their consciences, is not only among the choicest of their blessings, but also of their rights."
Paul F. Boller, Jr., George Washington and Religion 179-80 (Southern Methodist University Press, 1963).
James Madison, a key delegate to the Constitutional Convention and a primary author of the Bill of Rights, also recognized and emphasized the individual right *465 and duty to worship God. In his 1785 "Memorial and Remonstrance Against Religious Assessments," Madison stated:
"The Religion then of every man must be left to the conviction and conscience of every man; and it is the right of every man to exercise it as these [reason and conviction] may dictate. This right is in its nature an unalienable right.... It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him."
Madison further stated:
"This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign."
Norman Cousins, "In God We Trust": The Religious Beliefs and Ideas of the American Founding Fathers 308-14 (Harper & Bros., 1958).
Given that the Founders of our Nation regarded the right to worship God both corporately and individually as the core of religious liberty, it is no surprise that they placed it at the very beginning of the First Amendment to the Bill of Rights. It therefore stands to reason that they would have regarded any law or court order prohibiting a person from worshipping God as the very epitome of tyranny and would have been shocked by a court order prohibiting a parent from teaching the worship of God to her child.
Indeed, no aspect of religious freedom is more treasured than the right of parents to teach their children to worship God, which right has been recognized by the United States Supreme Court. See Pierce v. Society of Sisters, 268 U.S. 510, 535, 45 S.Ct. 571, 69 L.Ed. 1070 (1925)("The child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations."), and Wisconsin v. Yoder, 406 U.S. 205, 213-14, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) ("[T]he values of parental direction of the religious upbringing and education of their children in their early and formative years have a high place in our society ....").
The religious instruction of children is important not only for society generally, but also particularly for parents who believe, as does Laura, that the worship of God through faith in Jesus Christ is the only way of salvation and that God Himself has commanded parents to teach His commands to their children:
"Hear, O Israel: The Lord our God, the Lord is one.
"You shall love the Lord your God with all your heart and with all your soul and with all your might.
"And these words that I command you today shall be on your heart.
"And you shall teach them diligently to your children, and shall talk of them when you sit in your house, and when you walk by the way, and when you lie down, and when you rise."

Deuteronomy 6:4-7.
Given the unique importance of fundamental religious rights  particularly where they overlap fundamental rights of free speech  courts should act with the highest caution when considering an order restricting the exercise of these rights. Regrettably, this level of caution appears *466 to have been sorely lacking in paragraph 3(j) of the trial court's order.

V.

The Alabama Constitution recognizes the inalienable right to worship God and to freely express that worship of God.
The Alabama Constitution provides clear recognition of the inalienable right to worship God. The Alabama Religious Freedom Amendment, Amend. No. 622 to § 3, Ala. Const.1901, provides in the relevant part of Section V:
"(b) Government may burden a person's freedom of religion only if it demonstrates that application of the burden to the person:
"(1) Is in furtherance of a compelling governmental interest; and
"(2) Is the least restrictive means of furthering that compelling interest."
Paragraph 3 of section IV defines "Government," in part, as "[a]ny branch ... instrumentality, [or] official . . . of the State of Alabama." Because the Alabama judicial system is a branch of civil government, the trial court's order is subject to this Amendment, which was designed to function as a strong wall protecting Alabamians' free exercise of religion from state interference.[15]
The Alabama Constitution likewise provides strong support of Alabamians' God-given freedom of expression. Article I, § 4, of the Constitution of Alabama of 1901 provides:
"[N]o law shall ever be passed to curtail or restrain the liberty of speech or of the press; and any person may speak, write, and publish his sentiments on all subjects...."
Even if a type of speech is not protected by a single constitutional provision, however, it will still receive the highest protection where it overlaps another right recognized by the Constitution. In the instant case, the expression restricted by the trial court is religious speech, which involves overlapping free-exercise and free-expression rights. Thus, that part of the trial court's order is subject to the Religious Freedom Amendment to the Alabama Constitution, which requires the court to demonstrate that its order furthers "a compelling [civil] governmental interest" by "the least restrictive means."

VI.

The trial court's order violates the Constitution of Alabama by impermissibly infringing on Laura's inalienable rights.
As I state in Part I of this dissenting opinion, the only interest offered by the trial court to justify stripping Laura of her fundamental right to teach her child the worship of God is that doing so will prevent the daughter from feeling "unnecessarily confuse[d] or pressurize[d] [sic]" because of the differences in her parents' religious views and practices. I find such a rationale to be thoroughly unpersuasive.
I can find no precedent in law and no foundation in reason to support the notion that an attempt to ensure the protection of *467 a child from pressure and confusion resulting from differences of opinion between parents falls within the jurisdiction of the state.[16] Even if, through exceptional circumstances, the state could acquire such jurisdiction, preventing a child's "unnecessary" feelings of pressure or confusion would hardly rise to the level of a "compelling [civil] government interest" as required by the Alabama Constitution to justify state interference with the God-given religious freedom of its citizens.
But even if, arguendo, one could contrive a "compelling state interest" in a child's not feeling unnecessarily pressured or confused  and justify the right of the civil government to enter the sphere of family government to ameliorate those feelings in a child  the means to that end as chosen by the trial court in the instant case is far from the "least restrictive means" required by the Alabama Religious Freedom Amendment.
In fact, the final part of paragraph 3(j) of the trial court's order constitutes nothing less than a blanket prohibition on Laura's right to speak to her child about certain core principles of her conservative Christian faith  including absolute standards of right and wrong and absolute beliefs about the afterlife  merely because her former husband does not share these core principles.
The trial court's order even prevents Laura from answering theological questions posed by her daughter whenever Laura's honest answer would reveal conflicts with the views or practices of the father. Given the mutually exclusive viewpoints of Laura and her former husband, the trial court's order ultimately forces Laura to choose between forgoing her free-exercise and free-expression rights or forgoing her right to visitation with her child. Such a result is hardly the least restrictive means by which to meet the trial court's announced end.
In addition, the trial court's use of the passive voice ("[T]he religious training of the child ... shall be made by example....") makes the order so broad that it would apply to Laura's husband Brian (and anyone else visiting in the Snider home). This is highly troubling, because Brian was not a party to the case and his free-exercise and free-expression rights are also entitled to protection under the Alabama Constitution. This overly broad aspect of the trial court's order is yet another way in which it is not the least restrictive means to its announced end.
It would not have been difficult for the trial court to modify its order slightly to come as close as possible to achieving its announced end without violating Laura's fundamental rights recognized by the Alabama Constitution. Instead of issuing a blanket "gag" order against Laura's uttering any religious teaching that might be contrary to William's religious views or practices, the trial court could have ordered Laura to qualify every such comment with a statement to the following effect: "This is what Mommy believes from the Bible, but Daddy believes something different. Sometimes parents disagree." Such an order would acknowledge real differences of opinion between parents without favoring one denominational viewpoint over another.
To be sure, the child would be left with some confusion as a result of the approach I propose. But whatever confusion this approach would cause is likely to be less than the confusion resulting from Laura's *468 trying to explain why she is completely prohibited from answering many of her daughter's basic questions about God. If Laura were to respond to her daughter with, "The judge may punish me if I answer you," or "If I answer you, honey, you may not be able to see Mommy again," or some other, similar answer, the child would be more confused than if her mother could answer sincerely according to her beliefs and merely add the comment that some people, including Daddy, do not believe the same thing.
Even if, upon further review, my suggested modification of the order is found wanting, I have no doubt that, upon this Court's direction, the trial court could easily identify other language that accomplishes the least restrictive means required under the Alabama Constitution.
To view the issue from another perspective: If the Alabama Legislature had passed a bill restricting parental rights in the same manner as does the trial court's order, this Court would not hesitate to strike it down as unconstitutionally vague, overbroad, and violative of fundamental rights. We should be no less vigilant to correct unconstitutional actions in our own branch of civil government.
Consequently, rather than quashing the writ of certiorari, this Court should sustain the writ for the purpose of reversing the final part of paragraph 3(j) of the trial court's order and remand the case for the trial court to issue a new order consistent with the Alabama Constitution.
NOTES
[1] The divorce judgment prohibited the parties from encouraging the child to address parties other than William and Laura by names such as "mother" and "father" or words of similar import.
[2] Laura testified that the child's further training in ice skating was discontinued because ice skaters dress in "revealing" outfits and skate to music that is unacceptable to Laura and Brian.
[3] The record reveals that, from February 2001 until October 2002, Laura's and Brian's ministry work took them and the child to Minneapolis, Indianapolis, Waterbury (Connecticut), Brunswick (Maine), Owosso (Michigan), Ontario, Orlando, Montreal, Greenville (South Carolina), and Nepal. Apparently, the trip to Nepal took place shortly after the 9/11 terrorist attacks on the World Trade Center and the Pentagon.
[4] The movie was "Miss Congeniality," starring Sandra Bullock. A PG-13 rating indicates that some material in the movie may not be suitable for children under the age of 13.
[5] Members of Laura's own family supported the change of custody. Indeed, her own parents testified against their daughter, and in favor of their former son-in-law, at the final custody hearing.
[6] Failing to raise an issue in a petition for a writ of certiorari is not a minor error. In fact, had Laura's petition and brief in support been filed after this Court amended Rule 39, Ala. R.App. P., to provide that, before a brief in support of a petition for certiorari may be filed with this Court, we must first grant the petition for the writ, Laura's brief, which was the only filing that contained any reference to the trial court's restriction on religious training, would have been stricken without this Court's having seen it. In petitions filed after the rule change, this Court rules upon a petition for the writ of certiorari without considering any brief impermissibly filed in support of that petition.
[7] As previously noted, the trial court found that "[t]he Mother and Brian Snider have told this child that her Father and maternal grandfather are `going to hell,' knowing that the people referred to are loved and cared for very much by the child."
[8] Hilley is the only authority Laura cites in support of her argument that the trial court exceeded its discretion by restricting her religious training of the child.
[9] See Ex parte Lipscomb, 660 So.2d 986, 989 (Ala.1994) ("[M]atters of child custody are never res judicata, and the circuit court retains jurisdiction over the matter for modification upon a showing of changed circumstances."). The same rule applies in matters involving visitation. T.K.T. v. F.P.T., 716 So.2d 1235, 1239 (Ala.Civ.App.1998).
[10] As previously noted, Laura filed no post-judgment motion after the trial court entered its modification order. As also noted, she did not raise the issue in her petition for the writ of certiorari, and she argues it entirely within the span of one page in her brief in support of that petition, where she cites as authority only one case, Hilley.
[11] The majority opinion objects to my statement of the facts not because it is untrue but because the majority believes it reflects a view of the evidence "most favorabl[e] to Laura." According to the majority, my account of the facts is "not appropriate" because it does not reflect a due deference to the trial court's perspective on "`disputed evidence in ore tenus proceedings.'" 929 So.2d at 451 (quoting Ex parte Pielach, 681 So.2d 154, 155 (Ala.1996)). If the facts as I recount them were disputed and I only restated Laura's account, my statement would indeed fall short of the standard cited by the majority opinion; however, because the facts I recount were not disputed (indeed, many of them were taken directly from the testimony of witnesses supplied by William, the party favored by the trial court), the majority's objection is misplaced.
[12] In an effort to disguise from the court the quantity of beer he consumed, William altered his check register by whiting out references to the purchase of beer and, in one entry, wrote "root" in a different ink color in front of the word "beer."
[13] The stepmother also claimed that disregarding Laura's standard for swimwear was necessary for safety reasons, stating that she bought alternative swim attire to "make sure [the child] doesn't drown because her clothes are falling off her."
[14] The majority opinion contends that I read the trial court's order "too broadly" because "[n]othing" in it "prevents Laura from teaching the child every facet of the Christian faith and every principle and lesson contained in the Bible." 929 So.2d at 457 (emphasis added). According to the main opinion, "any parent" can teach the whole counsel of God to a child "without disparaging ... [a] former spouse." 929 So.2d at 457.

Of course, the contention of the majority cannot be true, because holding firmly and consistently to one interpretation of the Bible (or any book, for that matter) logically precludes other, contradictory interpretations. Where the contradiction is between the understanding of one spouse and the practices of another, to teach the understanding of the one is necessarily to disparage the practices of the other.
For example, if one parent is a Christian and the other is a witch, the Christian parent could not teach that the Bible condemns witchcraft as an "abomination" (see, e.g., Deuteronomy 18:10: "There shall not be found among you anyone who burns his son or daughter as an offering, anyone who practices divination or tells fortunes or interprets omens, or a sorcerer or a charmer or a medium or a wizard or a necromancer, for whoever does these things is an abomination to the LORD.") without implicitly disparaging the parent who practices witchcraft.
Furthermore, if the child asked explicitly if the pagan parent was doomed to Hell for practicing witchcraft, the Christian parent would have to choose between teaching what the Bible says (see, e.g., Galatians 5:19-21, which teaches that those who practice witchcraft, among other things, will not go to Heaven) and obeying the court order to refrain from a teaching that would in any way be disparaging of the beliefs of the other parent.
Something very similar occurred in the instant case, in which the child asked her mother if William was going to Hell and, based on her understanding of the Bible and her knowledge of William's beliefs, Laura said "Yes." Such a reply may sound harsh to those who favor a more liberal or universalist view of salvation (certainly the trial court considered it harsh), but it is outside the proper jurisdiction of a state court in Alabama to prohibit such an utterance by favoring the denominational view of one parent over that of the other.
To take sides in this manner, as the trial court did, is no less than state endorsement of a particular religious denomination. This is impermissible in Alabama, in which the people have declined to establish a particular denomination as the official state religion.
[15] In fact, Alabama's constitutional protection of the right to worship God was designed to be stronger than that of the Constitution of the United States as interpreted by the United States Supreme Court. In response to, among other cases, Boerne v. Flores, 521 U.S. 507, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997), which struck down the federal Religious Freedom Restoration Act, Alabamians showed that our state motto  "We dare defend our rights"  is no mere slogan by ratifying the Alabama Religious Freedom Amendment in 1999.
[16] See Ex parte G.C., 924 So.2d at 674 (Parker, J., dissenting), for an overview of the different government jurisdictions  the individual, the family, the church, and the state  established by God.